# First National Bank of Chicago *v.* The W. J. Hartzell Company, Appellant.

*Carriers—Bills of lading—Passing of title.*

Where an owner of a carload of eggs in Chicago on December 11, 1909, bills the car to himself at Pittsburg with notice to a corporation doing business in that city, and then makes a draft on such corporation, and sells the draft to a bank in Chicago with the bill of lading indorsed, and turned over to the bank, the title to the goods passes to the bank, and it may maintain its right of ownership to them as against the corporation in Pittsburg which has refused to accept the draft, and has seized the goods under a foreign attachment on a claim in another matter against the maker of the draft; and this is the case both under the law of Illinois and under the Pennsylvania Act of September 24, 1866, P. L. (1867), 1363, then in force.

Argued May 1, 1913.   Appeal, No. 182, April T., 1913, by defendant, from judgment of C. P. Allegheny Co., Jan. T., 1910, No. 764, on verdict for plaintiff in case of First National Bank of Chicago v. W. J. Hartzell Company.   Before Rice, P. J., Henderson, Morrison, Orlady, Head and Porter, JJ.   Affirmed.

Feigned issue to try title to goods levied upon in foreign attachment.   Before Swearingen, J.

At the trial the court gave binding instructions for plaintiff.

On a rule for a new trial Swearingen, J., filed the following opinion:

On December 11, 1909, the Northern Produce Exchange of Chicago, Illinois, shipped via the Wabash Railroad a car, containing 200 cases of eggs, and received at the same time a bill of lading from said railroad company.   The bill showed the goods were consigned to the shipper's own order at Pittsburg, Pennsylvania, with directions to notify W. J. Hartzel Company of Pittsburg, where the latter was engaged in business.   On the same day, the Northern Produce Exchange drew a sight draft

upon the W. J. Hartzel Company for the price of the shipment, to wit: $1,275, to the order of the First National Bank of Chicago, Illinois, and attached thereto the said bill of lading, indorsed in blank, and these were then in that condition delivered by it to said bank. At the same time, the said bank credited the account of the Northern Produce Exchange with the amount of the draft and sent the draft, with the bill of lading attached, to its correspondent in Pittsburg, Pennsylvania, for presentation. The draft was duly presented to the W. J. Hartzel Company, which refused to accept and pay the same, and it has never been paid. Subsequently, to wit: December 14, 1909, the W. J. Hartzel Company issued a writ of foreign attachment against the Northern Produce Exchange upon another claim, and attached the said car of eggs in the custody of the carrier. On December 16, 1909, said goods being perishable, the court, by agreement of the Northern Produce Exchange and the W. J. Hartzel Company, ordered that the same be sold by the sheriff to said W. J. Hartzel Company for the sum of $1,275, the freight charges to be paid by the purchaser, and that the sheriff take and hold the said sum of $1,275 in lieu of the goods attached, subject to the further order of court. On January 15, 1910, the First National Bank of Chicago was, by leave of court, allowed to intervene as a defendant, and an issue was ordered. Subsequently, the money was, by order of court, paid to the bank, which then gave a satisfactory bond instead.

On December 20, 1912, by agreement, the previous order for intervention was amended as follows:

"That an issue be framed, wherein the First National Bank of Chicago, Illinois, shall be the plaintiff and the W. J. Hartzel Company defendant, for the purpose of determining the rights of the First National Bank of Chicago, Illinois, in one car of eggs taken under foreign attachment in the proceeding, the issue to be tried on the petition, answer and plea as filed."

In its petition for intervention, the First National

Bank of Chicago alleged that it had purchased said draft, with the bill of lading attached, and had paid the sum of $1,275 to the Northern Produce Exchange and thereby became the owner of said goods, prior to the issuance of the writ of foreign attachment. In its answer, the W. J. Hartzel Company denied that the bank was a purchaser for value of said bill of lading and averred that the bank was but the agent of the Northern Produce Exchange for collection of the draft.

At the trial, the facts hereinbefore stated were either admitted or were shown by the draft and bill of lading and by the records of this court. The only testimony offered by the First National Bank of Chicago was that of Charles Newhall, its cashier, whose deposition had been taken. He testified that the bank had bought the bill of lading and claimed as the owner of the goods; that the amount of the draft had been credited to the account of the Northern Produce Exchange; and that, although the latter's account was sufficient to meet the draft after the bank had notice of refusal of acceptance, the bank had never charged the amount back, and that the same had never been paid. He further testified that the bank was the owner of the goods represented by the bill of lading. There was no claim that the bill was taken as security for the draft.

No attempt was made to contradict the testimony to which reference has just been made.

At the close of the case, the court refused binding instructions in favor of the W. J. Hartzel Company and it granted binding instructions in favor of the First National Bank of Chicago; and the verdict was rendered accordingly. The former then made a motion for judgment non obstante veredicto and also a motion for a new trial, and these have been argued. The argument was made upon the motion for judgment non obstante veredicto; no brief was furnished upon the motion for a new trial.

The contention of the W. J. Hartzel Company is that

the First National Bank of Chicago never became the owner of the goods, and that at most the bank never had anything but a lien, which claim it has not asserted. In other words, the claim is that the indorsement and delivery of the bill of lading did not pass title to the indorsee, unless there was a contract to that effect, and this must be shown aliunde.  On the other hand, the contention of the First National Bank of Chicago is that the indorsement and delivery of the bill of lading did pass title to the goods represented by it, and this being supported by the uncontradicted testimony aforesaid, the conclusion becomes irresistible.

Bills of lading have long been well recognized in commercial transactions.  They are the written evidence of the receipt of, and of a contract for the carriage and delivery of, specific goods.  Time out of mind they have been used as a basis for obtaining credits.  By their indorsement and delivery, exchanges have been facilitated and business transactions rendered more convenient.  This is so well understood that scores of transactions occur every business day upon the faith of their negotiability.  We cannot think that every time a merchant or a bank becomes the indorsee of a bill of lading, he or it must be prepared to prove by evidence outside the instrument that he was the purchaser of the goods or that they had been taken as security for the amount advanced.  In other words, it seems to us that a bill of lading is negotiable and that, from the fact of indorsement and delivery, a presumption of ownership of the goods arises in favor of the indorsee, which will prevail in the absence of proof to the contrary, of which there is none in this case.

Bills of lading are regarded as so much cotton, grain, iron, or other articles of merchandise: Shaw v. Railroad Co., 101 U. S. 557.

When it is said that bills of lading are negotiable, it is not implied that all the incidents follow such a transaction, that attach to the negotiation of certain instru-

ments, viz.: bills of exchange and promissory notes. For example, the innocent holder for value of a stolen bill of exchange or note will be protected even against the rightful owner. But this is only an incident of that kind of negotiable instruments, and it does not determine their quality as such. This incident does not attach to the indorsement and delivery of bills of lading. The reason for the distinction is that bills of exchange and notes represent money to be paid at a time certain, and they pass for money throughout the commercial world, while bills of lading represent merchandise which is to be received when delivered, it may be at an uncertain time. Therefore, there is no necessity that all the incidents peculiar to the negotiation of the former should attach to that of the latter, and they do not. What, then, is the test of negotiability—that which is common to all instruments of that character? It is the fact, that by indorsement and delivery thereof the title passes, so as to enable the indorsee to sue upon the contract in his own name. This circumstance determines whether or not an instrument is negotiable. In the commercial world, bills of lading have always been used for the purpose of transferring the title to the goods represented thereby, by the indorsement and delivery thereof, so that the indorsee could recover upon the contract. What contract? Why, the contract for the delivery of the goods, of which the bill of lading is the symbol. When one lawfully receives a bill of lading, he is regarded in the law as being in possession of the goods, as much so as if he had received the things themselves; and, presumptively at least, he had a better title, for he has a written muniment of a peculiar character. The principle is therefore established that bills of lading are negotiable. Title to the goods represented by them passes upon indorsement and delivery of the written instruments (in some cases it is even held that indorsement is unnecessary), so that the indorsee may assert his own ownership. They are every day transferred by

indorsement and delivery, and this is called negotiation, being prima facie at least the mode and effect of a transfer. They are symbols of ownership of the goods specified therein. They pass from hand to hand by indorsement and delivery. This means something in commercial law. In 4 Am. & Eng. Ency. of Law (second edition), 548 this statement of the rule is given:

"When the consignor draws upon his consignee for the purchase money, and the draft with the bill of lading attached is indorsed or transferred to some one who discounts the bill of exchange, a special property in the goods thereby passes to the transferee, subject to be divested by the acceptance and payment of the draft. And if the consignee refuses to accept the draft, the title of such transferee becomes absolute."

This is what happened in the case at bar. The bank became the indorsee of the bill of lading attached to a draft to its own order for the full amount of the transaction, and credited the account of the drawer. This was all before the drawee of the draft refused to accept it. It is not disputed that the bank has never been paid. It promptly intervened and claimed ownership of the goods; that is, it looked to the drawee or the goods for its money. This assertion of ownership of the goods is a fact in the case. We cannot hold, as the W. J. Hartzel Company contends, that the bank is but the agent of the Northern Produce Exchange for collection, in the absence of any testimony to that effect.

If this was an Illinois contract, we are of opinion that the case is ruled in favor of the bank by the decision of the supreme court of that state in Walsh v. Bank, 228 Ill. 446. The report of that case discloses that on October 9, 1905, the Maguire Milling Company of Hiawatha, Kansas, shipped a car of flour consigned to itself at Chicago, Illinois, with directions to notify Walsh and Company. The next day it indorsed the bill of lading and delivered it to the First National Bank of Hiawatha, with a sight draft attached, drawn

by the milling company on Walsh and Company, for $702. The milling company was a regular customer of the bank. The amount of the draft was credited to the deposit account of the milling company by the bank, and the draft, with the bill of lading attached, was forwarded to the First National Bank of Chicago for collection. Walsh and Company attached the flour for a previous claim. The draft was not paid and was returned to the bank but was not charged back to the milling company. The bank interpleaded and claimed the flour. There was a verdict in favor of Walsh and Company. Upon appeal, this judgment was reversed. The court said:

"The milling company had transferred the flour to the appellee by the indorsement and delivery of the bill of lading, and appellee had given credit on a deposit account for the amount of the draft. The milling company would have no right to repossess itself of the flour without payment of the draft, and appellant has no better right. This is true, whether the amount of the credit by the bank had been checked out or not. Appellant was to have the bill of lading and flour in payment of the draft but not without. Appellee was in no sense the agent of the milling company to collect the draft payable to the order of the appellee. If the appellee exercised proper diligence and failed to obtain payment of the draft, it could charge it back to the milling company, but it is clear that until that should be done, the milling company would have no right to the flour. . . . There can be no dispute of the proposition that the title to the flour was in the appellee and not in the milling company. . . . The indorsement and delivery of the bill of lading to the appellee operated as a symbolical delivery of the flour and had the effect of transferring the same and vesting the title to it in the appellee:" Walsh v. First Nat. Bank of Hiawatha, 228 Ill. 446.

If, on the other hand, this was a Pennsylvania con-

tract, under our statute, approved September 24, 1866, P. L. (1867) 1363, bills of lading are made negotiable, to the extent indicated in this opinion at least; and that statute was in force on December 11, 1909, when this contract was made: Richardson v. Nathan, 167 Pa. 513; Shaw v. Railroad Co., 101 U. S. 557.

We are therefore of opinion that the law of the case is with the First National Bank of Chicago and that the motion for judgment non obstante veredicto ex parte the W. J. Hartzel Company must be refused.

We are not convinced that any error was committed at the trial. Consequently, the motion for a new trial must be refused.

*Error assigned* was in giving binding instructions for plaintiff.

*N. R. Criss*, for appellant.

*Wm. E. Schoyer*, with him *Lyon & Hunter*, for appellee.

OPINION BY HEAD, J., October 13, 1913:

The Northern Produce Exchange of Chicago shipped a carload of eggs to Pittsburg. The bill of lading issued by the carrier showed that the consignor had billed the car to itself at Pittsburg. It contained the further direction that the W. J. Hartzell Company should be notified of the arrival of the car. At the same time the consignor drew a draft on the Hartzell Company for the price of the merchandise. This draft it sold for value to the First National Bank of Chicago and at the same time indorsed and turned over to the bank the bill of lading. The bank forwarded the draft with the bill of lading attached to its correspondent in Pittsburg. When presented in due course to the Hartzell Company, payment was refused, and that company, without payment of the draft, could not secure the bill of lading

and was therefore unable to obtain possession of the merchandise.

On account of a claim arising out of some previous transaction, the Hartzell Company began an action in foreign attachment against the consignor and had the sheriff attach the contents of the car referred to. As the merchandise was perishable, an order was obtained from the court out of which the writ issued directing that the goods be sold, the proceeds of such sale to remain in the hands of the sheriff in lieu of the property. The Chicago bank, claiming that it was the owner, and therefore entitled to receive the proceeds resulting from the sale of the goods, asked and obtained leave to intervene and the trial proceeded.

It having been made to appear from the evidence, which in this respect was undisputed, that the Chicago bank was the bona fide holder of the draft referred to and the bill of lading, the learned trial judge directed a verdict in its favor and afterwards entered judgment thereon. The Hartzell Company appealed. The assignments of error rest on the single legal proposition that there was no sufficient evidence to warrant the conclusion that the bank was the owner of the property attached, and therefore that the court should have directed a verdict for the appellant.

If the transaction between the Produce Exchange, the consignor, and the bank in Chicago, is to be regarded as governed by the laws of Pennsylvania, the question must be disposed of in the light of our Act of September 24, 1866, P. L. (1867), p. 1363, then in force. That act provides "That warehouse receipts, given for any goods, wares, merchandise, &c., deposited with any warehouseman, &c., or bills of lading, or receipts for the same, when in transit, by cars, &c., shall be negotiable, and may be transferred, by indorsement and delivery of said receipt, or bill of lading; and any person to whom the said receipt, or bill of lading, may be so transferred, shall be deemed and taken to be the owner of the goods

therein specified, so as to give security and validity to
any lien created on the same, subject to the payment of
freight and charges thereon, &c." In the face of this
statute it is of no moment to argue that the position,
legally speaking, of the Chicago bank, after it had pur-
chased the draft and become the indorsee of the bill of
lading, was that of lien creditor rather than owner.
Even if it be granted that the consignor had some in-
terest, in the nature of an equity of redemption, in the
property, in case it should sell for more than the amount
of the draft, nevertheless the statute has declared that
the interest of the bank was that of an owner. As a
consequence, upon proof of the necessary statutory
facts, the court below could not have done otherwise
than declare that the bank was such owner for every
purpose necessary to secure and enforce its claim.

In Richardson & Co. v. Nathan, 167 Pa. 513, we have
a case practically on all fours with the one at bar.
There was, however, in that case one fact which appar-
ently made a situation more favorable to the contention
of the appellant here than the one presented by this
record. That was the special form in which the bill of
lading had been indorsed. It was there argued that
the form of the indorsement was evidence that no in-
tention existed to transfer the title to the property.
After considering the nature and effect of the indorse-
ment as made, Mr. Justice McCollum, speaking for
the court, goes on to say: "Thus considered, the effect
of it was to invest the appellant with the rights of a
purchaser of the property, so far as it might be neces-
sary to exercise such rights for its protection: 2 Am. &
Eng. Ency. of Law, p. 243, and cases there cited. In
other words, the appellant, after the delivery of the
bills, must be deemed and taken to have been the owner
of the property for the accomplishment of the purpose
for which it was pledged: Act of September 24, 1866,
P. L. (1867), 1363."

There is nothing in this decision conflicting with the

earlier case of Bissell v. Steel, 67 Pa. 443, on which the learned counsel for appellant largely relies. In that case there was no room for the operation of the statute we have quoted because the bills of lading had never passed by indorsement to the person claiming to be the holder of them. The statute therefore is not mentioned in the opinion of the court and the report of the case shows that it was cited only by counsel for defendant in error to sustain his proposition that unless a bill of lading is indorsed it passes no property. Under such circumstances the case turned largely on the question of the pleadings and the court held that the principles declared in Meyers v. Prentzell, 33 Pa. 482, and Stewart v. Wilson, 42 Pa. 450, were controlling. An examination of those cases will show the soundness of the reasoning on which they proceeded and their inapplication to the case at bar, viewed in the light of the statute.

If the transaction between the bank and the Produce Exchange be viewed in the light of the law of the state of Illinois, the appellant is in no better situation. Proof was duly made at the trial that the law of that state was to be found in the case of Walsh v. First National Bank of Hiawatha, 228 Ill. 446. The facts of that case and the legal principles controlling were cited at length in the opinion of the learned court below entering judgment on the verdict and in the brief of the learned counsel for the appellee presented to us. The correctness of these citations is not questioned. They impel us to the conclusion that the judgment entered by the learned court below is just as clearly supported by the law of the state of Illinois as it is by the law of our own state. The assignments of error are overruled.

Judgment affirmed.